1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2   -----------------------------x
                                      24-CR-492(NRM)
 3   UNITED STATES OF AMERICA,
                                      United States Courthouse
 4            Plaintiff,              Brooklyn, New York

 5            -against-               January 21, 2025
                                      9:30 a.m.
 6   DEWITT JOHN,

 7            Defendant.

 8   -----------------------------x

 9      TRANSCRIPT OF CRIMINAL CAUSE FOR BOND REVOCATION HEARING
                 BEFORE THE HONORABLE NINA R. MORRISON
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   For the Government:       JOHN J. DURHAM, ESQ.
                               INTERIM UNITED STATES ATTORNEY
13                             Eastern District of New York
                               271 Cadman Plaza East
14                             Brooklyn, New York 11201
                               BY:  BROOKE THEODORA, ESQ.
15                             Assistant United States Attorney

16   For the Defendant:        FEDERAL DEFENDERS OF NEW YORK
                               One Pierrepont Plaza
17                             Brooklyn, New York 11201
                               BY:   JULLIAN D. HARRIS-CALVIN, ESQ.
18

19   Also Present:             DEWITT JOHN, DEFENDANT
                               PROBATION OFFICER LOPEZ
20                             SPECIAL AGENT HAMPSCH, FBI
                               JESSICA HERNANDEZ, INVESTIGATOR
21

22   Court Reporter:           AVERY N. ARMSTRONG, RPR, NYRCR
                               Phone:  718-613-2419
23                             Fax:    718-613-2639
                               Email:  Aarm.edny@gmail.com
24

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

PROCEEDINGS                                    2

1          (In open court.)

2          THE COURTROOM DEPUTY:  Criminal cause for a bond

3    revocation hearings 24-CR-492.  USA v. Dewitt John.

4          Counsel, please state your appearance for the

5    record, starting with the Government.

6          MS. THEODORA:  Good morning, Your Honor.

7          Brooke Theodora for the United States.

8          THE COURT:  Good morning.

9          PRETRIAL OFFICER LOPEZ:  Good morning, Your Honor.

10          Valeria Lopez for Pretrial Services.

11          THE COURT:  Good morning.

12          SPECIAL AGENT HAMPSCH:  Good morning, Your Honor.

13          Audra Hampsch, FBI.

14          THE COURT:  Okay.  Good morning.

15          MS. HARRIS-CALVIN:  Good morning, Your Honor.

16          Julian Harris-Calvin of Federal Defenders of New

17    York, on behalf of Mr. John, who is present.  I'm also joined

18    at counsel table by Jessica Hernandez, who is an investigator

19    at our office.

20          THE COURT:  Okay.  All right.  Good morning,

21    everyone.

22          So we are here today for a hearing on a application

23    to revoke Mr. John's bond, initiated first through filing a

24    violation memorandum by pretrial services last week, at which

25    point I set the hearing.  I then received some correspondence

PROCEEDINGS                                              3

1   from defense counsel seeking to obtain access to certain

2   seized devices and additional records in order to better

3   prepare for the hearing, which I construed, as noted in my

4   docket entry, as a request to adjourn the hearing, since over

5   a holiday weekend, it would not be possible to fulfill that

6   request.  Prior to the hearing, I denied the application

7   adjourn.  I indicated I would hear the parties out today, and

8   determined at this point whether I wanted to proceed with the

9   substance of the revocation motion.  Thereafter, I believe it

10  was early this morning, it may have been late last night, I

11  received a written motion by the attorneys for the Government

12  to revoke Mr. John's bond, and I have reviewed that, along

13  with the records provided.  I was familiar, having gone back

14  and reviewed the original detention memo by the Government

15  with the same facts and circumstances that they relied upon

16  regarding Mr. John' history and the current charges.  But they

17  additionally made certain arguments about the legal standards

18  for revocation in light of the violations asserted by pretrial

19  through the recent home visit and seizure of certain devices

20  from Mr. John.

21          So let me start by opening it up to you,

22  Ms. Harris-Calvin, to respond to the motions since I've

23  heard -- I've received a lengthy submission from the

24  Government and from pretrial, and ask first, whether you're

25  continuing to oppose revocation, and if so, let me have you

PROCEEDINGS                                4

1    address -- I know you indicated in your memo, I think

2    correctly -- that these were as alleged, technical violations

3    because pretrial had not alleged that Mr. John had committed

4    an additional crime, though they did express some concerns

5    about the age of the minor victim -- excuse me, the minor or

6    the young woman who was depicted in the photographs on his

7    camera role.  There was not an allegation in that memo that at

8    that point they were aware when he had obtained those

9    photographs and whether she was, in fact, a minor at the time.

10   Nonetheless, while I guess technically correct, these would be

11   technical violations as alleged, they certainly strike me as

12   exceptionally serious ones, given the number of them, his

13   conduct towards pretrial, and the underlying charges at issue

14   and the use of the internet as a means of committing the

15   crimes that he's alleged to have committed for which he's

16   facing charges in this Court.

17          So let me hear you out, in general, on response and,

18   in particular, are you disputing any of the facts asserted by

19   pretrial, or are you arguing, if you are opposing revocation,

20   that even if I accept them on proffer as true, that those

21   facts alone do not meet the legal standards for revocation or

22   something I should not order.

23          MS. HARRIS-CALVIN:  Sure.  Also, I have one addition

24   before I answer the Court.

25          THE COURT:  Sure.

PROCEEDINGS                      5

1          MS. HARRIS-CALVIN:  Is that the Government last

2     night or late afternoon also filed an additional letter to the

3     Court regarding this.

4          THE COURT:  Yes.

5          Excuse me, I forgot to note that on the record,

6     regarding, what the Government maintains was the mootness of

7     your request to have -- to hold off on the request to have the

8     devices sent to the FBI, as pretrial had requested, because

9     the Government indicated that they had actually already

10    obtained a judicial warrant signed by Judge Merkle permitting

11    those devices to be inspected and transferred to the FBI.  So

12    I have reviewed that, as well.

13         MS. HARRIS-CALVIN:  Okay.  And I would like to be

14    heard on that, but I'm happy to answer your questions first.

15         THE COURT:  Sure.  Just start with the substance of

16    the revocation, and then I'm happy to hear you on those other

17    issues, as well.

18         MS. HARRIS-CALVIN:  So I'm certainly still opposing

19    revocation, Your Honor.  And I'm disputing some of the facts

20    or at least some of the inferences from the facts raised in

21    the revocation report and the Government's motion joining the

22    revocation request.  And I'd like to respond to them each,

23    like I said, it's three categorize.  One, is obstruction or

24    concealment of the devices, the second is communication with a

25    potential victim or victims, and the third is Reddit activity.

PROCEEDINGS                          6

1    I think they also noted something about Discord, which, you

2    know, I haven't been able to access the devices involved, so I

3    can't directly address.

4            But I'll start with obstruction or concealment of

5    the devices.  So I think it's untrue, the inference, that

6    Mr. John attempted to circumvent his conditions or obstruct

7    pretrial services' ability to inspect the devices.  The

8    pretrial officer only knew about the 20 additional hard drives

9    or devices because he told pretrial services that they

10   existed.  And so -- and they also only knew about that Android

11   that he said was dumped counsel from a smart phone to a dumb

12   phone because he pulled it out in front of the pretrial

13   services officer.  So I think that is an indication that he

14   wasn't trying to conceal the devices.  Otherwise, he wouldn't

15   have told them about it or pulled it out in front of pretrial.

16           And then third, with respect to the so-called

17   jailbreak.

18           THE COURT:  What about the fact that he refused to

19   turn over -- he did say that he had about 20 hard drives, but

20   refused to turn them over at that point.

21           MS. HARRIS-CALVIN:  Right.  So he didn't refuse what

22   to term them over.  What he said was that they were all over

23   the place and they were all over the place because the

24   Government or the FBI had executed a search warrant when they

25   arrested him, and we all know what happens when search

PROCEEDINGS                    7

1    warrants are executed, stuff is everywhere.  So he actually

2    did compile them later on.  But it was his understanding that

3    at a home visit, she would pick them up from him.  I have them

4    here today.  Happy to turn them over right now.  He brought

5    them with him today.  But I think it was more of a, like,

6    logistical misunderstanding as opposed to trying to conceal

7    it.  So I think that's number one with respect to that.

8            With respect to the jailbreaking of the phone, I

9    think it's consistent with what he told pretrial services.  I

10   will admit, Your Honor, that it is a violation, even if the

11   phones were dumbed down.  He should have gone to pretrial

12   services and said, I'd like to dumb down a smart phone and

13   have a third party do it for me and have you authorize that,

14   because I need a QWERTY keyboard not the numeric keyboard

15   that, like, some of us who were alive back in the day, you

16   know, Cingular Wireless, that he isn't used to texting on.  So

17   yes, he should have done that.

18           But with respect to him jailbreaking it with some

19   nefarious intent, we have confirmed, and I have Ms. Hernandez

20   here today as an investigator, we've confirmed that a third

21   party actually jailbroke it for him, and the -- the software

22   that was accessed or download was necessary to do the dumbing

23   down.  I'm not an IT professional, we have IT professionals at

24   my office, which is part of the reason why I asked to get the

25   device or get a Cellebrite report of the device so that they

PROCEEDINGS                                8

1    could look to see if what actually was downloaded and sequence

2    of events or whatever, was consistent with that story.

3           But as far as I know with the little bit of

4    information that I have, what has been reported as the

5    activity accessing the internet and downloading particular

6    applications is consistent with dumbing -- the necessary

7    applications for dumbing down the phone.  And we've confirmed

8    that a third party actually did the dumbing down of the phone.

9           And then, fourth, with respect to this category of

10   allegations, in terms of the password for the phone, so the

11   pretrial services report says that he couldn't give her -- he

12   said he couldn't give her the password for the phone, and that

13   that's because it's an 18-character password consisting solely

14   of symbols and numbers that are on a specific different kind

15   of keyboard than what the QWERTY keyboard is.  It's called an

16   AOSP keyboard -- another thing that I wanted to confirm if he

17   had access to it -- where it's easier to memorize by swinger

18   swipes than knowing all of the different weird symbols for

19   18-character password.  And when she handed him the phone so

20   he could do the face ID, and he was swiping on this AOSP

21   keyboard, he did so.  So it wasn't like he complete refused,

22   he just said, I can't verbally tell you what this password is.

23   So, again, it shows that he wasn't trying to conceal, that he

24   wasn't refusing to help access the phones.  So those are my

25   factual arguments with respect to obstruction and concealment

PROCEEDINGS                              9

1    of the other devices.

2              Regarding communication potential --

3              THE COURT:  Before you move on, let me ask you about

4    a couple more things that were in the violation memo.

5              One was that at least one of the Android phones that

6    was in his possession was actually connected to the home

7    router when pretrial inspected it, so there was active

8    internet access.

9              What's your response to that.

10             MS. HARRIS-CALVIN:  I'm not quite sure which phone

11   that was.  I think it might have been the phone that I turned

12   over, over the weekend or after the weekend passed.  So there

13   are several other people who live in the home.  His younger

14   brother, who's a college student at Syracuse University as a

15   mechanical engineer has access to those devices, as well.  So

16   Mr. John is not the only person who had access to those

17   additional device that either I turned over or that pretrial

18   obtained on the home visit.  And so I can't really speak to --

19   again, if I had access to it, maybe we can see the context to

20   connect dots.  I can't answer that question for you.

21             Sorry, did you have another one with respect to that

22   category?

23             THE COURT:  Yeah.  So let me double check, because

24   the one that I recall reviewing was that it was actually

25   Android Number 1 that was in Mr. John's pocket when pretrial

PROCEEDINGS                              10

1   was there, and that when she checked the home router, it was

2   that particular phone, i.e., the one in his pocket that was

3   connected to the internet.  I don't know, Ms. Lopez, if I'm

4   straighting that correctly.

5           PRETRIAL OFFICER LOPEZ:  Correct, Your Honor.

6           THE COURT:  So that when he indicated that he didn't

7   know the necessary information both to access the phone, I

8   understand -- I think as a technical matter, I understand the

9   argument you're making with respect to the phone just like

10  when someone says, well, I can't tell you the password because

11  it's 18-characters long, put you can share it by putting

12  AirDrop through somebody's phone next to it or giving them

13  permission or doing a kind of swiping to open it.  I

14  understand your argument.  I am quite concerned about the fact

15  that there was a phone that was physically in his pocket that

16  was connected to the internet given how clear Judge Bloom was

17  about that particular term of release.

18          So if that's not something you're prepared to

19  address today, I understand, but that is something I wanted to

20  ask you about.

21          MS. HARRIS-CALVIN:  Could I have a quick moment?

22          THE COURT:  Sure.  Absolutely.

23          (Pause in the proceedings.)

24          MS. HARRIS-CALVIN:  I think at some point I might

25  want to respond to that, but I don't think at this moment,

1    just because again --

2              THE COURT:  I understand.  There's certain discovery

3    that you're seeking and there's time that you may need to look

4    at this.

5              Let me and you -- and this may be something that

6    you're not prepared to address today -- but in the text

7    messages from that same particular phone, Android 1, exchanged

8    with this individual named Angie, he, in the messages that I

9    saw, repeatedly asked her for her Snap, meaning, her Snapchat

10   account so that he could communicate with her on that

11   platform.

12             As I trust you know, Snapchat itself, to use it does

13   require access to the internet.  Even though there was no

14   direct evidence that he actually had used Snapchat to

15   communicate with her, don't you think the fact that he was

16   repeatedly asking someone who he was texting with, and went so

17   far as to say he wanted to communicated with her on a

18   unmonitored platform supports pretrial's intent to conceal

19   argument and certainly has some indication he wouldn't be

20   asking for her Snapchat if he didn't have a Snapchat account

21   and access him himself?

22             MS. HARRIS-CALVIN:  Right.  And I understand the

23   Court's concerns about that.

24             I have a couple of responses.  One is definitely

25   going to be grounded in my ability to have a little more

1    context by having access to the devices.  But secondly, it's

2    my understanding there's multiple people having conversations,

3    and only one of those people can't access the internet, and

4    that's a -- that's the difficulty.  And I think what feels

5    like a gray area for Mr. John.  And when I -- I was planning,

6    when I got to the point of conditions that are able to -- that

7    he's able to comply by, I was going to ask for some additional

8    instruction from the judge around what might feel like a gray

9    area when he's communicating with a group of people and he's

10   the only one that's not on the internet, if the Court

11   understands what I'm saying.

12            THE COURT:  Why don't you go ahead and make that

13   now.  So go ahead tell me both what you think the gray area

14   was with respect to Snapchat use and what conditions or

15   combination of conditions you think will be sufficient to

16   address the concerns about internet access and the like.

17            MS. HARRIS-CALVIN:  Okay.  Mr. John has a brother

18   who's also college-aged student, and also has a bunch of other

19   friends that all know each other and are all conversing.  And

20   so he can converse with individual folks in the

21   non-internet-accessible way even though the rest are having

22   conversations on multiple platforms that he cannot access.

23   And so I think what we saw in the video and the photos that

24   pretrial sent to the judge -- to the Court and counsel, that

25   he was saying, I don't want to talk about what's going on --

PROCEEDINGS                                    13

1    basically, she was asking, what's going on with the case, and

2    he was, like, I don't want to talk to you about it because

3    this is a phone pretrial can look at, and his lawyer tell us

4    him not to say thing that the Government could potential say

5    or talk at all about his case.  But particularly, if he's

6    going to talk about it, not talk about it in a way that the

7    Government might have access to, even if it's completely above

8    board, just don't talk about your case.  So I think he was --

9    what he was trying to do is say, like, I don't want to take

10   about the case on this phone that pretrial is monitoring, but

11   he could have another person who's on Snapchat or the other

12   platforms explain to her what he's telling them about the

13   case, and he's happy with them telling her about the case on

14   those platforms.  So that's what was going on there.  So it

15   feels like -- this is his first time in federal court with

16   these kind of conditions -- that feel likes a little bit of a

17   gray area.  He was making judgment calls.  So now that we see

18   this is a problem, it's easier now for the Court to be, like,

19   okay, you can or cannot do this, speak through third parties,

20   et cetera, et cetera.

21           THE COURT:  And do you think it's the same lack of

22   clarity in the original conditions of release or gray area,

23   given his experience and the context about Reddit and Discord,

24   or is there a different issue with respect to the screenshot

25   of those?

PROCEEDINGS                              14

1            MS. HARRIS-CALVIN:  The Discord I think I need more

2   information on.  For Reddit, that is actually something that

3   involves his mental health treatment that he's getting.  So

4   pretrial services has him in mental health treatment through

5   them, and then he also comes and sees a social worker from my

6   office once a week.  She would be here today, but she's very

7   sick, so she's not.  And one of the homework assignments she

8   gave him -- and I just want to double check my notes because I

9   wasn't part of that conversation.

10           THE COURT:  Sure.  Take your time.

11           MS. HARRIS-CALVIN:  Give me a hot second.

12           (Pause in the proceedings.)

13           MS. HARRIS-CALVIN:  Oh, here it is.

14           So she had asked him to think about his life's

15  turning points, and turning points are events or situations

16  that significantly impact a person.  And speaking about them,

17  those turning points, can be helpful for someone who has a

18  hard time talking about themselves.  Because he cannot be

19  online, he had asked somebody else if they can look up online

20  the kind of turning points that other folks have identified

21  and how they've talked about their turning points so that he

22  could have some kind of example of, like, what a turning point

23  is, how to articulate it.  So he had actually raised that with

24  our social worker, who then raised it with me, and then we

25  were, like, oh, I get what you're trying to do there, but

PROCEEDINGS                           15

1    technically, pretrial services is correct that you can't have,

2    like, a photograph of what somebody else had looked up, even

3    if it's above board, for this purpose.

4            I can't -- I don't have enough information for the

5    Discord situation.

6            THE COURT:  Right.  So the one reasonable

7    interpretation, based in particular on the information that

8    you have that you're urging me to consider if I understand it

9    correctly is that at least with respect to the Reddit, the

10   screenshot shows only that he had access to a photograph

11   someone took of a Reddit chat or a Reddit conversation.  But

12   there wasn't any evidence at least at the point where they had

13   downloaded or obtained what they had obtained from this phone

14   at the time of the violation that he personally had access to

15   Reddit and that it may have been a good-faith attempt to

16   comply with his mental health treatment by getting someone

17   else to screenshot the Reddit forum?

18           Am I understanding that?

19           MS. HARRIS-CALVIN:  That's what I'm saying to the

20   Court now, and I think if I had access to this device, I might

21   have made other strategic decisions.  But I don't have that

22   ability.

23           THE COURT:  Okay.  Understood.

24           Why don't you go ahead and proceed with the other

25   two categories of grounds for the violation you wanted to

1    address.

2              MS. HARRIS-CALVIN:  Yes.  Thank you.

3              So I think I've already talked about to the Reddit

4    screenshots, so there's just one other category, which is

5    communication with potential victims.  So I think there's a

6    bit of a dishonest representation in both the Government's

7    letters to the Court and the search warrant application,

8    because the woman depicted in the bralette and panties is

9    neither a child nor is that child porn, to have, you know,

10   what we see in Victoria Secret ads every day.

11             And there's -- Mr. John has had this phone where

12   those pictures were downloaded from only during pretrial

13   period.  During the pretrial period this person is of age.

14   And so there's nothing improper or criminal about him

15   communicating with this adult person.

16             There was also no reason for me or Mr. John to know

17   that this woman who we're saying is the Polish woman or that

18   is now being called John Doe 3 or Jane Doe, excuse me, 3.

19   There's no reason for us to know that she was a subject of the

20   Government's investigation.  She's not in the indictment.

21   She's no in the complaint.  So I think that actually raises a

22   problem with condition number 11 of the order which is really,

23   really broad, and expects Mr. John to be clairvoyant and know

24   who the Government might be investigating as a potential

25   victim, even if they're currently an adult.  So I would ask

PROCEEDINGS                    17

1    that when I talk a little bit more about the conditions that I

2    think would be better imposed, that we would change the

3    language of condition number 11 so he's put on notice, because

4    there's a notice problem there, I think.

5              And so that's what I have for those, like, three

6    factual categories.  And at some point I'm happy to go on to

7    the Government's argument about danger.  I don't think flight

8    is really an issue, but if the Court wants to hear about that,

9    I'm happy to talk about that.

10             THE COURT:  Sure.  One thing I neglected to ask you

11   about was, in addition, and this might be something that also

12   is tied to the information you have available to you.  But

13   there was also in the memorandum and then noted in the

14   Government's motion, two other aspects of the Android

15   Number 1, the phone from your client's pocket, that there were

16   two online applications downloaded, Termux and MIXplorer, as

17   well as a file related to Fennec, which is a less used, but

18   still established web browser made by the people who make Fire

19   Fox, so that he had download on internet-capable devices, and

20   then there's this question of the rooting or the rootedness of

21   that mobile device, which allows for customization of the

22   system settings and this potential for concealing access to

23   the internet.

24             So let me have you address those and what the

25   implications are there for internet access.

PROCEEDINGS                              18

1          MS. HARRIS-CALVIN:  And that's Android 1.

2          THE COURT:  Yes.  So for reference so you have it,

3    I'm looking at Page 8 of the Government's memo which is

4    reiterating factual allegations set forth in the pretrial

5    violation memo at pages two and three.

6          MS. HARRIS-CALVIN:  So that's the jailbreaking.  The

7    rooting is the jailbreaking that I was talking about earlier,

8    and the accessing of those application, the Fennec and the --

9          THE COURT:  That someone else had done that for him.

10         Explain to me how, based on your understanding,

11   adding a browser is a way to dumb down a phone.

12         Why is that something that would be used,

13   theoretically, to dumb down a phone?

14         MS. HARRIS-CALVIN:  So my high-level conversation

15   with the IT professionals at my office, the tech

16   professionals, is that you have to get to the internet and

17   find the application that needs to be downloaded to allow you

18   to basically break the way the phone operates so that you can

19   take off the internet capability.  So you first have to access

20   the internet, get the app, do the thing, and then delete all

21   the things once you're done dumbing down the phone.  So

22   that's, like -- he said that's -- theoretically, what you can

23   do, but he couldn't speak more specifically about --

24         THE COURT:  What happened on this phone.  Right.

25         MS. HARRIS-CALVIN:  -- because, yeah, we don't have

PROCEEDINGS                          19

1   access to it.  That's part of the reason why I asked for the

2   phone.

3            THE COURT:  Okay.  All right.  Understood.

4            Okay.  Let me have you -- before I turn to pretrial

5   and the Government, let me have you address what you think

6   would be a reasonable -- since I'm obligated to consider, of

7   course, whether there's any combination of conditions that

8   could ensure the safety of the community and compliance with

9   the terms of the bond that you think would mitigate some of

10  the, either confusion or risk of willful violations present

11  here.

12           MS. HARRIS-CALVIN:  Sure.  So I think first is with

13  respect to the 20 devices.  I initially thought for pretrial

14  to give a deadline, but I have them here with me.  I could

15  hand over.  I think there are 17 because three of them belong

16  to his brother, who is now up at school with those devices

17  using them in his computer for his mechanical engineering

18  degree that he's seeking.  The second is just clear

19  instruction from the Court that, you know, dumbing down a

20  smart devices is a violation, right.  Even though it might be

21  an attempt to comply with no internet access, even having a

22  third party do it without first getting pretrial approval is a

23  technical violation, which I think at this point, he probably

24  doesn't need the Court to say.

25           Also, some of the devices that he had, he is

PROCEEDINGS                          20

1    professionally an IT professional, and so he has, you know,

2    friends, they're the other folks that give him a hard drive or

3    a device to fix manually, whether or not he accesses the

4    internet.  So I think it's clear now, but can be made clear by

5    Court, that he can't even help other people physically repair

6    their devices even if he's not accessing the internet.  So the

7    Court can clearly just say, you're not allowed to have any

8    devices other than the Jitterbug that pretrial approves, even

9    if it's for professional tech repair purposes.

10          And then just some modifying language on

11   Condition 11 about being on notice about who is a potential

12   target of the Government's --

13          THE COURT:  Did you think with respect to his work

14   as an IT professional -- it didn't seem to me that Judge Bloom

15   was unclear about the implications about granting bond and

16   home incarceration on his work.  Meaning, I know this is what

17   you do, but you cannot have any devices and do this work,

18   because it would give you access to this internet.

19          I'm not sure if how he's going about repairing

20   someone's device if he can't access the internet to see if

21   it's actually working and how he could have understood it

22   otherwise.  But explain to me what you think the confusion

23   was.

24          MS. HARRIS-CALVIN:  So he stopped working his --

25          THE COURT:  Do you need a minute to talk to him?

PROCEEDINGS                              21

1    That's fine.  You can take a minute.

2                 (Pause in the proceedings.)

3            MS. HARRIS-CALVIN:  Okay.  He reminded me that he

4    did tell me this.

5            So for a bunch of the devices that pretrial will

6    find out can't actually be turned on, he's had them since

7    before his arrest, and these are leftover devices that had

8    been given to him for doing some fixing or repair and were not

9    repairable.  So you know, the clients or folks that had given

10   them to him for repair didn't receive them back because they

11   were not usable.  So again, pretrial can take a look at them

12   and see --

13           THE COURT:  So these are ones that he had prior to

14   the execution of the warrant and when they came to execute the

15   warrant, they did not seize these devices?

16           MS. HARRIS-CALVIN:  Yeah, those 20 devices that were

17   listed to pretrial had been at his home at execution of the

18   original search warrant and not retrieved.

19           THE COURT:  Okay.

20           MS. HARRIS-CALVIN:  Also, Your Honor, at some

21   point -- and this doesn't necessarily have to be today -- I do

22   want to address pretrial's role as an arm of the Court and the

23   confidentiality with which they're supposed to be operating,

24   and I think the fact that pretrial sits at the Government

25   counsel's table is a clear representation is how pretrial

PROCEEDINGS                          22

1    services -- not just this officer, but generally -- doesn't

2    play that role which is very different than probation's role.

3            THE COURT:  Okay.  Thank you.

4            Let me start with you, Ms. Lopez.  I'd like to hear

5    from you -- and you should feel free to pull one of the

6    microphones over -- just directly from you about the

7    circumstances under which the home inspection was conducted.

8    And I'd like to you address the concerns that

9    Ms. Harris-Calvin raised that what you might have

10   understandably at the time construed as evasion of his duty to

11   turn over either the passcode or the devices, might have been

12   some confusion on his part about what you were asking for, or

13   by opening up his phone, he was actually giving you the access

14   you requested, including access to the router which you got

15   while you were there, as well as this issue which I know is

16   separate about these devices belonging to other people and

17   whether he intended to give them to you, but just wasn't able

18   to gather them up in that moment.

19           So let me have you address those things and then we

20   can talk about some of the other issues.

21           PRETRIAL OFFICER LOPEZ:  Sure, Your Honor.  I will

22   speak on the home visit first.

23           So part of the condition is that we are allowed to

24   inspect the router to see if there's any other devices hooked

25   on the network.  So at the time, the defendant was home alone,

PROCEEDINGS                                          23

1    so all the devices conducted on the network were either in the

2    possession of the defendant or just in the possession of the

3    home when no one was there.  When I asked him for the router

4    log-in, the defendant said he didn't know the password.  He

5    said my brother knows and I said, call you brother.  In that

6    instant, he pulled out the phone, looked at it, dialed, and

7    started pacing around.  Then I told him, hey, you're not

8    supposed to have this device because he was only supposed to

9    have the Jitterbug phone, which I spoke to him and his mother

10   about, I confirmed with both of them that they retrieved the

11   device, and installed it.  Then, you know, I was able to log

12   into the router and then see that there was a device that was

13   connected to the router that wasn't previously on the network,

14   and in that time, I told the defendant to provide me the

15   password to the phone that he had in his pocket which he said

16   he didn't know the password.  So then I noticed it had facial

17   recognition, and I asked him to -- I directed him to unlock

18   the password with miss face, facial recognition, and remove

19   the password, which he did by, like, entering the password

20   with the regular keyboard.

21          Then I checked --

22          THE COURT:  So that didn't appear to you to be a

23   swiping or a code?

24          PRETRIAL OFFICER LOPEZ:  It wasn't a swipe or a

25   special code or anything.  It was an actual keyboard.

PROCEEDINGS                        24

1          Then I confirmed that on the about phone and on the

2     router, it had the same name, which was OnePlus Basic, I

3     guess, is what it's called.  And then I took the phone --

4          THE COURT:  And I'm sorry, I want to make sure I get

5     the technicalities correct because we're talking about

6     different devices and different connections.

7          When you say the device that you're talking about,

8     this is what's referred to in your memo as Android Number 1?

9          PRETRIAL OFFICER LOPEZ:  Correct.

10         THE COURT:  Which is the phone that was in his

11    pocket?

12         PRETRIAL OFFICER LOPEZ:  Correct, Your Honor.

13         THE COURT:  So that's one that had been signed the

14    name OnePlus Basic?

15         PRETRIAL OFFICER LOPEZ:  Yes.

16         THE COURT:  Go ahead.  Continue.

17         PRETRIAL OFFICER LOPEZ:  So then I asked to see the

18    defendant's phone which was on his dresser which was about

19    10 percent of battery.  It had no SIM card in it.  And then

20    when I took the Android 1 with me, he stated that he wanted it

21    back because it had the SIM card on it which was the SIM card

22    that was originally in the Jitterbug phone.  I asked him what

23    other devices besides the Jitterbug and the T.V. that he had

24    in his room he had in his possession, and there were two iPads

25    and an additional phone on the dresser which he did say that

PROCEEDINGS                                    25

1    they were broken and that friends had gave the devices to him

2    to fix.  I took those devices with me, as well.

3            I did make multiple attempts to contact his mother

4    because he did say his mother knew about the Android 1, and I

5    wanted to clarify if she did know about the device, because

6    she was well aware that that he was only supposed to have the

7    Jitterbug phone.

8            THE COURT:  When you say, she was well aware, was

9    this -- when was the conversation you had with him and his

10   mother about what phones he was supposed to possess?

11           PRETRIAL OFFICER LOPEZ:  This was in December.  I

12   just don't know the date off --

13           THE COURT:  Okay.  But during a prior home visit?

14           PRETRIAL OFFICER LOPEZ:  I called both of them

15   separately.  That's when I found out he had the original flip

16   phone which is the -- the other one that had internet.  Oh,

17   the Summit flip.  So I called them both and let them know that

18   he wasn't supposed to have this device and that he had to buy

19   a Jitterbug phone, and then I followed up with her and she

20   confirmed that she had purchased it and she installed it, and

21   he was inserting the SIM for that phone, so I can communicate

22   with him through the Jitterbug.

23           I also asked him about the hard drives.  So he did

24   provide a list to me during initial post-release.  It's about

25   24 hard drives.  I asked him where they were and he said

PROCEEDINGS                                      26

1    everywhere.  So I told him get all the devices, you know,

2    compile all the devices because he would have to surrender

3    them to me.  I didn't specifically say when, but I just needed

4    him to compile all the devices.  When I got back to the office

5    is when I asked for --

6              THE COURT:  So let me just ask you this:  So at the

7    moment when you said I'm going to need a list of the devices,

8    you weren't looking to take them with you right then, you

9    wanted him to surrender them to the office once you got back?

10             PRETRIAL OFFICER LOPEZ:  Yeah, because he said they

11   were everywhere, so I wasn't sure, like, what that meant, of

12   they were in the home or somebody else had them.

13             And then with counsel's assistance, she was able to

14   retrieve another device, another Android device, that was also

15   rooted.  And that's pretty much from the home visit.

16             I do want to address how we do our post-releases

17   when defendants are initially released.

18             THE COURT:  Sure.

19             PRETRIAL OFFICER LOPEZ:  So we typically have them

20   fill out a form called the computer internet usage form.  In

21   that form, the defendants are directed to provide us log-in

22   information for the router, Wi-Fi, social media.  We also have

23   a hardware usage form which is the one that he provided the

24   hard drive list.  In the computer use form, the defendant did

25   not put that he had any social media accounts -- and he didn't

1    put that he had social media accounts, and then when we looked

2    at the phone, when we inspected the device, it showed that

3    there was a picture taken with the Android 1 of Reddit, and at

4    the bottom, there was Discord already, like, on that desktop.

5    He's also made aware that he's not allowed to have anyone else

6    use any type of social media or any other devices on his

7    behalf.  He was made aware that he was only allowed to have

8    one phone that had a non-internet usage.  Same thing with his,

9    mother she was also spoken with -- to about the same thing.

10         And then speaking about the pictures and the

11   screenshots that we provided the Court, so again, the picture

12   that was taken of the desktop, it was taken with the

13   Android 1.  Using the -- having somebody else use a device on

14   his behalf is a violation in of itself, because it's used by

15   third-party proxy.

16         THE COURT:  Right.  So a person who's banded from

17   internet use can't say, can you go on and look this up for me

18   or send somebody a message because of the risk that the

19   indirect communication will violate the purpose for which the

20   restriction was put in place initially?

21         PRETRIAL OFFICER LOPEZ:  Correct.

22         THE COURT:  When you say it was -- the desktop

23   picture was taken with the Android phone, how do you know that

24   it was actually taken with the phone as opposed to -- and I

25   understand in your view, this would still be a violation --

PROCEEDINGS                          28

1    somebody else took a screenshot of the desktop and texted it

2    to him, because he's allowed to have text messages?

3            How do we know that that's not what happened and

4    that that phone, the Android phone actually took the photo?

5            PRETRIAL OFFICER LOPEZ:  So each picture that's

6    stored on a device will show where it came from.  So it will

7    either show that it's from storage or it was taken with the

8    actual camera, and for this picture, it was taken from the

9    camera on the Android 1.

10           THE COURT:  Okay.

11           PRETRIAL OFFICER LOPEZ:  Referencing the mental

12   health.  So our counselor would not have had -- I just wanted

13   to clarify, our counselor was not the one who had him look up

14   the stuff on Reddit.

15           THE COURT:  I didn't understand his lawyer to make

16   that argument.  My understanding was that your counselor had

17   given him an assignment reflect on a turning point --

18           PRETRIAL OFFICER LOPEZ:  -- not a mental health

19   counselor.

20           THE COURT:  Right.  And that understanding -- and I

21   think some of this was with the social worker in their office,

22   as well.  And again, I'm not saying what view I take of this

23   argument.  But my understanding of the defense counsel's

24   argument is that, like many people of his generation and many

25   generations now, when someone says to do something or reflect

PROCEEDINGS                    29

1    on something, people often go to the internet to either get a

2    sense of that inquiry looks like, other ideas, and the like.

3    So even though he knew he was restricted from accessing the

4    internet, that the purpose of that access in defense counsel's

5    view was that he was trying to comply with his mental health

6    treatment.  But I understand your -- that's not something you

7    would have directed him to do or your office would have.

8             PRETRIAL OFFICER LOPEZ:  Or our contracted

9    counselors wouldn't have directed him to do that, as well.

10            THE COURT:  Okay.  I didn't hear saying that they

11   were directing him to access the internet, but just that that

12   was the context for why he thought he would have been able to

13   do or sought to do so.

14            PRETRIAL OFFICER LOPEZ:  And I just do want to

15   emphasize that the defendant is on the most restrictive

16   conditions, you know, third-party custodian, no internet

17   usage, he is on home incarceration, and there's no other

18   reasonable conditions that we could provide the Court that

19   will reasonably assure and mitigate danger with this.

20            THE COURT:  Okay.  Let me ask you a couple of other

21   questions.

22            Do you know if the iPad -- did you seize the iPad on

23   that date?

24            PRETRIAL OFFICER LOPEZ:  Yes.

25            THE COURT:  Do you know if the iPad was enabled for

1   the internet, as well, at the time seized it?

2           PRETRIAL OFFICER LOPEZ:  All three devices that he

3   did state they didn't work, they don't turn on.

4           THE COURT:  Okay.  The woman named Angie who he was

5   exchanging the messages with, do you have any information at

6   this time about whether at the time they were exchanging

7   messages, she was or was not over the age of 18?

8           PRETRIAL OFFICER LOPEZ:  No, Your Honor.

9           THE COURT:  And the camera role on the Android phone

10  that had the photographs of the young woman who was identified

11  later as a potential Jane Doe Number 3, though, I take it, an

12  uncharged case at this point, do you have any information

13  based on what was in the photographs about when the

14  photographs were exchanged, how they were exchanged, or

15  anything like that?

16          PRETRIAL OFFICER LOPEZ:  No, Your Honor.

17          THE COURT:  Or any information about how recent the

18  contact was with this young woman named Angie?

19          PRETRIAL OFFICER LOPEZ:  All I have is the date of

20  the pictures which is December 27th.

21          THE COURT:  So the photos were taken on

22  December 27th, according to the photos --

23          PRETRIAL OFFICER LOPEZ:  Yeah, they're in the

24  storage dated December 27th.

25          THE COURT:  Okay.  Okay.

PROCEEDINGS                          31

1          All right.  So let me hear from counsel from the

2    Government just on a couple of issues.

3          I've read your memo, and as I said, went back and

4    read your original detention memo.  Tell me if there's

5    anything -- I want to talk about this question of internet

6    usage and have you respond to the defense's argument that even

7    if a violation -- because as they acknowledged, he should have

8    asked pretrial for permission to alter the keyboard, to make

9    it easier to exchange text messages which he was permitted to

10   do.

11         That the fact that there was in the file history,

12   some indication of an internet browser, and they've

13   represented, they've spoken to a third party -- who I believe,

14   though, I could be confused -- may have contacted your office

15   at some point or contacted pretrial, who indicated that he was

16   the one, this third-party friend of his, is the one who did

17   the alteration.  That it may not have meant that Mr. John was

18   accessing the internet, but instead, somebody had used that

19   phone to do so for purposes of altering the keyboard.

20         So let me hear from you on that and this related

21   issue of internet access.

22         MS. THEODORA:  Sure.  And can I just clarify who was

23   the third party, the friend that --

24         MS. HARRIS-CALVIN:  No.

25         THE COURT:  Okay.  The friend -- tell me,

PROCEEDINGS                    32

1  Ms. Harris-Calvin, I'm sorry I don't understand.  There was --

2  and I apologize, it was a lot of material for me to take in,

3  in a short period of time.  There was some individual who at

4  one point contacted pretrial, who is a friend or client of

5  your client's, no?  Is that incorrect?

6          MS. HARRIS-CALVIN:  I've got no knowledge of this.

7  I'd love to hear who this third party is.

8          THE COURT:  Okay.  I may be confusing this with, you

9  know, another matter or something else I read in the record.

10 So, there was some person who has at least contacted you and

11 indicated that he or she was the one who altered the phone to

12 permit new QWERTY keyboard typing of some kind.

13         MS. HARRIS-CALVIN:  Yes, I reached out to this third

14 party who confirmed with my investigator and me that they did

15 the alterations.  But I don't believe it's whoever else you

16 are you talking about.

17         THE COURT:  Okay.

18         MS. THEODORA:  So our position is the same.  We

19 think it's a clear violation of the conditions of release that

20 he was using an internet-capable phone.  Pretrial, which is

21 the first Android, the OnePlus phone.  The condition of his

22 release is that he cannot use internet-capable devices, unless

23 they can be monitored by pretrial services.

24         There can be no serious dispute that an Android

25 smart phone is an internet-capable device, regardless of

PROCEEDINGS                              33

1    whether it accessed the internet, regardless of whether it was

2    rooted to be configured so it couldn't access the internet --

3    there is no dispute -- there can't be any serious dispute that

4    an Android is internet-capable.

5             There also can't be any serious dispute that it

6    wasn't being monitored by pretrial services, and that pretrial

7    services saw him using it when Officer Lopez watched him pull

8    it out of his pocket and call his brother.  That is -- we

9    would submit that that is the end of the Court's analysis.

10            The suggestion that the defendant is allowed to

11   single-handedly, whether it's by a third party or otherwise,

12   and we would ask that counsel put on the record what the name

13   of this third party is that purportedly did this.  The

14   suggestion that the defendant can single-handedly -- and

15   without pretrial services approval and monitoring, and,

16   actually, in complete circumvention of what pretrial services

17   has told the defendant about the types of phones that he is

18   able to use.

19            It's just -- it's really illogical that he would be

20   able to root a smart phone to be able to use on his release,

21   especially given that the use of the internet goes to the

22   heart of the charges in this case.  The defendant has been,

23   since 2014, using the internet to sexually exploit and

24   threaten young women and minor girls.

25            It's -- again, this is just completely at odds with

PROCEEDINGS                    34

1   everything the magistrate judge instructed at the detention

2   hearing and everything that pretrial services has told him.

3          I want to pause and see if the Court has any

4   questions about that.  There are several things that I'd like

5   to address with respect to what counsel has said today.

6          THE COURT:  Sure.  I want you to go ahead with that.

7   I don't think I have any more questions about the particular

8   internet issue we were just discussing.

9          Let me ask you this:  Based on what you know so

10  far -- and I don't know if the return on the warrant has come

11  back to you -- but is there any indication that the defendant

12  actually was using Snapchat or Reddit or another social media

13  account other than the indication in his messages with this

14  person named Angie?

15         MS. THEODORA:  We only have -- we have not executed

16  the warrant yet.  We only have what pretrial has told the

17  Court.  So that's all we know.  But we do -- I do actually

18  have an update on the hard drives.  The agent -- the case

19  agent who's sitting with me here, Special Agent Hampsch, was

20  out of town this weekend, she was out of the country for the

21  long weekend.  And with respect to the hard drives -- and this

22  will also go to Counsel's question about who this friend is.

23         So, in December, somebody called me and said they

24  were a friend of the defendant.  I had them speak,

25  voluntarily.  I had them reach out to the special agent, they

PROCEEDINGS                           35

1    sat voluntarily for an interview, and said that they had been

2    given hard drives by the defendant after -- I know you read

3    the detention memo.  So when the defendant became aware of the

4    outstanding arrest warrant in the summer --

5                THE COURT:  You're talking about the Virginia

6    warrant?

7                MS. THEODORA:  The Virginia warrant.  This friend

8    told the special agent that it spooked him, he had hard drives

9    and he wanted him to hold on to them.

10               Another friend has also since spoken to the special

11   agent.  Both of those friends gave the special agent hard

12   drives that the review is ongoing, but based on the reviews

13   thus far, there are hundreds of images of what appear to be

14   minor girls engaging in child sexual -- it's all child sexual

15   abuse material and they're engaging in sexually explicit

16   conduct.

17               What I understand from the agent is that each of

18   these hard drives has a note from the defendant that says,

19   essentially, This is the file for so and so victim, I think

20   that this should be distributed on the internet without paying

21   people, and so what we believe is that each of these hard

22   drives is the defendant's library of child sexual abuse

23   material.

24               The fact that these 20 -- over 20 hard drives were

25   not discovered during the search warrant is extremely

PROCEEDINGS                                      36

1   concerning to the Government.  The agent, who is, again,

2   sitting here with me -- they turned that house over, they took

3   pictures, they did not find -- they would have seized these

4   hard drives had they found them during the search warrant

5   because they were within the scope of the search warrant at

6   the time.  They were not at the house.  Which suggests that

7   the defendant had -- was having a -- kept them outside of the

8   house, given his knowledge of the outstanding warrant for his

9   arrest in Virginia, and was hiding them because he knew that

10  they contained child sexual abuse material.

11          Given all of that, his refusal to hand them over at

12  the pretrial services inspection in January until today, which

13  is almost two weeks later, is strongly indicative that he has

14  deleted evidence and destroyed evidence on these devices which

15  include child sexual abuse material.

16          THE COURT:  Let me just stop you there because I --

17  I understand certainly the concern you're raising about the

18  fact that there was a search warrant executed and Mr. John's

19  counsel today has represented that at least according to him

20  he possessed these hard drives at the time, the warrant was

21  executed, but they weren't taken.

22          So I certainly understand your argument that if he

23  possessed them in the house, they were concealed in a place

24  where the FBI managed not to find them or they were in his

25  possession but at the time they were executed, he had put them

PROCEEDINGS                                37

1   in some offsite storage or they were being held by someone

2   else.  I do think I heard Ms. Lopez say -- and I appreciate

3   her candor on this -- that at the moment, she did the

4   inspection in January, she had plenty, in her view, to go back

5   and do what she did, which was, prepare the violation memo and

6   alert the Court about the Android phone and the other facts

7   that she described in the memo in here today.  But at that

8   time after she asked him about the devices, she didn't ask him

9   to collect them and hand them to her on that date because he

10  was going to have some time to do that and then produce them.

11          So of all the things that you're alleging, I'm not

12  sure that I understand what Ms. Lopez reported to be that he

13  was refusing to hand over the hard drives on that date.

14          PRETRIAL OFFICER LOPEZ:  Sorry, Your Honor.  Let me

15  just clarify.  When I did e-mail defense counsel for

16  assistance, when I couldn't reach the third party, I did

17  request that all of the devices be surrendered, including the

18  hard drives on that same date that I conducted the home visit.

19  So he was supposed to surrender the devices by the end of that

20  date.

21          THE COURT:  Understood.  But you left without taking

22  them and he understood that he was supposed to collect them up

23  at the time you left?

24          PRETRIAL OFFICER LOPEZ:  Correct.

25          THE COURT:  Okay.  So continue with the rest your

PROCEEDINGS                                   38

1    comments.

2              MS. THEODORA:  And our position would be that his

3    comment, They're everywhere, there are over 20 hard drives, is

4    evasive and obstructive to pretrial services' monitoring of

5    them and was intended to not hand them over that day.  I think

6    that's all I wanted to say for now on the hard drives.

7              Does the Court have any other questions?

8              THE COURT:  No, I think that's I have on that.

9              MS. THEODORA:  I can just address some things.  I

10   know the Court has my letter and I think understands our

11   arguments.  So counsel said the obstruction didn't happen.

12   This was a logistical misunderstanding.  We obviously,

13   strongly object to that.

14             We also object that these are technical violations.

15   They're substantive violations of the conditions of his

16   release.  I don't think that there's any -- just because -- I

17   just don't agree with that characterization.  Again, the

18   password, he should have explained to pretrial if it was a

19   long password that required different swiping which pretrial

20   has said did not happen in her -- in what she witnessed, she

21   should have just explained that to pretrial instead of saying

22   he didn't know it.

23             In terms of counsel's statements about the

24   communication with the Polish young woman -- and I think she

25   said that there was a dishonest representation in the search

PROCEEDINGS                          39

1    warrant -- the search warrant says that the woman was born in

2    early 2006.  There's nothing dishonest about the search

3    warrant.  And I, in fact, had a conversation with Judge Merkle

4    about the victim's age and confirmed to her that this victim

5    is no longer a minor.  Our position is that --

6            THE COURT:  Meaning, Judge Merkle asked for

7    clarification about if she was born in early 2006, was she a

8    minor at the time of the earlier communications, but not a

9    minor now, and you disclosed those facts to her?

10            MS. THEODORA:  Yes.  I disclosed it.  It's also at

11    paragraph 15 of the search warrant affidavit.

12            Our position with respect to this victim is that the

13    photos that he has of her on this smartphone that he was not

14    supposed to be using -- that he was using in violation of the

15    conditions of his release show that he's continuing to stay

16    this contact with past victims, it's evidence of his -- well,

17    first of all, let me just take a step back.

18            So what we reviewed from the green -- there is a

19    green iPhone that we seized during the November 2024 search

20    execution of the search warrant.  That iPhone has months and

21    years of messages with this woman.  We've compared the

22    pictures.  They look -- we believe they're the same woman.

23    She has a Polish phone number and there's many, many different

24    images and videos of child sexual abuse material that are sent

25    by this woman to the defendant when she was 17 years old in

1    September 2023.  We've -- the special agent has reviewed the

2    videos.  She says her age in the messages.  These were on

3    Telegram.  We believe that his -- the fact that he had

4    pictures of this victim on his phone shows that he is

5    continuing to stay in contact with past victims, it shows he

6    continues to act on the same modus operandi, suggests he's

7    doing with it other victims that could be minors still today.

8           We don't -- we -- we think that the fact that she's

9    not a minor right now is not relevant to what we're alleging

10   this conduct shows.

11          THE COURT:  And I realize you're not relying

12   exclusively or even primarily on the fact that there were

13   these photos of a woman who is now over 18 on his phone that

14   show her, as defense counsel noted, in a bra and underwear,

15   rather than something that might meet the legal definition of

16   CSAM for someone who's over 18.

17          But what is your response to what defense counsel's

18   argument that at least with respect to the claim that he

19   committed a violation because he had contact with an actual or

20   potential victim, that Jane Doe Number 3, this was not the

21   charged case, and he was not put on notice that this now adult

22   woman was among those he couldn't exchange text messages not

23   even photographs with?

24          MS. THEODORA:  Sure.  So the conditions of the

25   defendant's release come from the -- I believe it's called the

PROCEEDINGS                               41

1   Hatch Act.

2            THE COURT:  Of the Adam Walsh conditions.  There's a

3   lot of names, but they incorporated by reference the special

4   conditions in the Adam Walsh Act.

5            MS. THEODORA:  And this is, I believe, one of those

6   conditions.  Excuse me.

7            And it says that he can't speak with potential

8   victims.  It doesn't require him to be clairvoyant to know

9   that he can't talk to this woman that sent him child sexual

10  abuse material, like, a year-and-a-half ago.

11           THE COURT:  Okay.  So let me make sure I understand

12  because there was a number of different facts you recited and

13  I note there's a long history here about prior child sexual

14  abuse material that you have access to.

15           So if I understand it correctly, you're saying that

16  the young woman, Jane Doe Number 3, who is now over 18, that

17  there was evidence in the iPhone that you seized from him,

18  previously, that is prior to the time that the pretrial

19  release conditions were set, that she had actually sent him,

20  not just photographs of herself in a bra and underwear, but

21  actually something that would qualify as CSAM.

22           MS. THEODORA:  Yes, several --

23           THE COURT:  At a time when she was under 18?

24           MS. THEODORA:  Yes.  Several videos.

25           THE COURT:  Okay.

PROCEEDINGS                     42

1          MS. THEODORA:  So I think we would just object that

2     the defendant doesn't have notice of that.

3          THE COURT:  Okay.  Okay.  All right.  Anything else

4     you want to address?

5          MS. THEODORA:  I mean, we would just reiterate that

6     this is a clear violation of the conditions, regardless of

7     whatever's on the phones.  It's very clear that the defendant

8     has tried to obstruct pretrial services monitoring.  He's

9     tried to hide his violations, and he cannot be trusted to

10    abide by his conditions going forward.

11         It's also very clear that he poses a danger to the

12    community and continues to do so.  So we believe that Your

13    Honor may definitely enter an order of revocation and

14    detention today.

15         THE COURT:  Okay.  Thank you.  Let me ask one other

16    thing I forgot to ask.

17         What's the status of the Virginia warrants?  I know

18    that he was supposed to address those as part of the

19    conditions that Judge Bloom set.

20         MS. HARRIS-CALVIN:  Yes, Judge Bloom directed me to

21    try to address that.  And so our investigator --

22         THE COURT:  Interesting given I'm making an educated

23    guess you're not barred in Virginia nor do you represent him

24    in that case, but tell me --

25         MS. HARRIS-CALVIN:  Correct.  I think it's just

PROCEEDINGS                                    43

1   easier for the counsel to just figure out what is going on.

2   Since they aren't seeking to come get him right now.

3           And so Agent Hampsch did -- I think we e-mailed

4   about it.  She was very helpful getting me the information

5   about the detectives there, our investigators of reaching out.

6   And so I think the idea is just to make sure that they realize

7   that there's happenings here and just trying to figure out if

8   there's a way to quash those warrants or what is the best next

9   step, more in like, a procedural way than anything really

10  substantive.  So we are making efforts.

11          THE COURT:  Okay.  All right.

12          Do you need a minute to speak with your client and

13  see if there's anything else he would like me to address or

14  hear from you on before I reach a conclusion here?

15          MS. HARRIS-CALVIN:  Only that I'd like to have some

16  arguments about dangerousness, and then at some point, address

17  the search warrant.

18          THE COURT:  Yes.

19          MS. HARRIS-CALVIN:  Okay.  So the question here is

20  about whether or not during the pretrial period since

21  November 19th, he has violated his conditions which I'm not --

22  I think we've made clear that there is some violation of his

23  conditions and the question is, like, the extent of those

24  violations, and if everything reported by pretrial or the

25  Government is a violation.  And you've heard me on that, so I

1  will not belabor the point there.

2          THE COURT:  I'm sorry.  Let me pause you for one

3  second.  I just looked at the clock.  I have another hearing

4  that was supposed to start 10 minutes ago and I just want to

5  check with Freddie about rescheduling.

6          (Pause in the proceedings.)

7          THE COURT:  Okay.  Please continue.

8          MS. HARRIS-CALVIN:  And so here, there is certainly

9  not probable cause to believe that during this pretrial

10 period, he has committed any new crimes.

11         And so I get that the Government is investigating, I

12 get that some of this information might help support a theory

13 at trial.  But at this point with respect to his activity

14 between arrest and today, there's no probable cause to believe

15 that he's committed any new crimes.

16         And I think I talked to you about some of the

17 conditions that I think, mostly admonishments and

18 clarifications that I think the judge can give would be

19 sufficient.  And I just wanted to point out -- you asked about

20 the text messages with the woman named Angie.  I did review

21 the video of, I think, Officer Lopez scrolling and it shows

22 that she's -- it looks like she's a college student with two

23 jobs, so I think that just implies she's over -- 18 or over.

24         So again, there's really no information that we had

25 to this point that he is engaging in any nefarious or improper

PROCEEDINGS                                    45

1    activity with minors on the dangerousness point.

2              And so, there is no new conduct that would make the

3    Court or should make the Court believe that he is a particular

4    danger to the community.  He is staying incarcerated at his

5    home, he's not engaging in conversations that we're aware of

6    or pretrial is aware of with respect to minors or any other

7    illegal activity, people who are currently minors.  He has

8    been forthcoming about the devices that he has at his house

9    when asked about it, even though it might be a technical

10   violation.

11             And our pretrial officer made clear, that he was

12   right, that some of these devices are broken, even though if

13   they had been working, they were inaccessible.  So I think

14   this is understandable why he might think it's fine to have

15   them.

16             And also, that there was a little confusion about

17   when he needed to turn over these 20 devices -- even though

18   contrary to what Government counsel argued -- even though the

19   agents did not seize these additional devices that I have here

20   today -- it doesn't appear that he was actually hiding them

21   because the very next day when he got arrested and then went

22   to pretrial services, he told them about it.

23             So again, this is him being more forthcoming about

24   his access to devices, which I think is more about his state

25   of mind than the potential for him to do the things that would

PROCEEDINGS                              46

1    be problematic for the Court, like, hide information.  And so

2    I don't think he is a particular danger or the Court should

3    think he's a particular danger.  And even if there's some

4    inkling that the Court believes he's going to continue to

5    violate at whatever level in terms of technical conditions, I

6    think that the conditions that I've asked the Court to order

7    should address that and get rid of any potential gray areas.

8             And I know that the Condition 11 is for part of the

9    Adam Walsh act, but that doesn't make it any less, kind of,

10   confusing.  I can advise him on --

11            THE COURT:  Let me just pull it out so I see which

12   condition we're talking about.  So, 11 --

13            MS. HARRIS-CALVIN:  And for the record, I can just

14   read it.  The defendant must avoid all contact, direct or

15   indirect, with any person who is or who may become a victim or

16   potential witness in the subject investigation or prosecution.

17            I cannot give him any direction on that.  I have no

18   clue who these people are.  And so, you know, I'm a lawyer and

19   I'm the one he would ask about this.  So I do think that if

20   the -- if there's any clear instruction, I'm happy for the

21   Government to try to negotiate some language or the Court to

22   come up with some language just to make it clear that he's on

23   notice.

24            THE COURT:  So I think that's a well-taken

25   suggestion and probably one which should be addressed more

PROCEEDINGS                    47

1    generally, especially in cases like this involving

2    communications with third parties who he may or may not know

3    are potential complainants in an ongoing investigation that

4    could be addressed at the time bond is set.

5              I think, let me have you address, briefly, though,

6    what the Government has proffered through the agent.  I didn't

7    ask the agent to reiterate because she was sitting here at the

8    table and nodding along and I took that to mean that the

9    Government's counsel was accurately reporting what she had

10   relaid, but that with specifically, the young woman of whom he

11   had the photographs from December 27th in his camera roll that

12   were transmitted on or about that date and taken on or about

13   that date, that he did actually have reason to know that she

14   was a potential victim or complainant in an ongoing

15   prosecution because the phone that had been seized from him

16   prior to his arrest had CSAM with her images in them.  So this

17   was someone from whom he had previously acquired CSAM.  I know

18   you may not have received all that discovery yet, but given

19   that at a hearing like this I can accept that on proffer,

20   that's a little more specific than simply any young woman out

21   there with whom he may be communicating, who he may or may not

22   know what their ages or who he may or may not be exchanging

23   prohibited images.

24             MS. HARRIS-CALVIN:  I think we as lawyers might be

25   able to make that calculus, that I'm talking to a person today

PROCEEDINGS                          48

1   who's 20 -- or whatever she is 19 years old or 18 years old,

2   but the Government might see on my many, many devices that I

3   had talked to her two years ago --

4           THE COURT:  Well, I think they're saying not just

5   talking to her, but that he possessed several videos in which

6   she was engaged in sexual activity, and that especially given

7   the two Jane Does with whom he had already been charged with

8   possession of those videos that it wasn't that big of an

9   inference to know that if there was someone with whom he had

10  communicated with previously and had told him she was born in

11  early 2006 that he would have known at the time that she was a

12  minor and shouldn't continue to be in contact with her.

13          MS. HARRIS-CALVIN:  I think that we didn't expect

14  that the lay person to know that the two named Jane Does are

15  13, all right, so if he was talking to them today that's

16  clear, very clear violation.  I don't think we can expect a

17  lay person to know that maybe the Government might be

18  investigating some sexual images from a girl who was at the

19  time 17, but now I'm talking to her above board at 18.

20          I just don't think we can expect that from a lay

21  person.  I certainly could have expected it, me or you or the

22  Government.  I just don't think that's a fair expectation.

23          THE COURT:  All right.  Let me hear you on the

24  issues about the warrant that you wanted to address.

25          MS. HARRIS-CALVIN:  So, Your Honor, I would ask that

PROCEEDINGS                                    49

1    the Court stays execution of that warrant right now, to

2    provide defense counsel leave to litigate the issue.

3    Particularly, because this was a live issue before this Court,

4    I had filed at the crack of dawn on Friday, a letter of motion

5    that was specifically spoke about a Court ordering pretrial to

6    give the devices to the FBI for the purpose of the FBI doing a

7    generalized forensic search.  And I talked about how doing so

8    would be violative, of not just the statutory pretrial

9    confidentiality relationship, but also the Fourth Amendment

10   with respect to the kinds of warrants.

11            A general warrant versus a warrant that is

12   particularized.  And we all knew that you would be considering

13   these issues today.  And the Government circumvented your

14   authority on reviewing that particular argument by going to a

15   magistrate judge who I presume but I'm happy to hear from the

16   Government was unaware that this was a live issue for your

17   consideration.

18            THE COURT:  So let me stop you there and ask

19   counsel.

20            Did Judge Merkle know that this issue had been

21   raised by defense counsel, previously?

22            MS. THEODORA:  Yes, she did.

23            THE COURT:  Okay.  And tell me in sum and substance

24   what was the discussion you had on that with her and did she

25   get a copy of the defense's letter and how did it get conveyed

1    to her?

2            MS. THEODORA:  No, she didn't have -- I just told

3    her that we were having a bond revocation hearing this

4    morning.  That was the reason for the emergency application,

5    and that defense counsel had asked for his -- she asked in the

6    letter for his devices back, and said that we needed to obtain

7    a search warrant.  I told -- I told her that when I submitted

8    the warrant.

9            THE COURT:  Okay.

10           MS. THEODORA:  She also asked if she was the one

11   that was going to preside over the bond revocation, and I

12   said, no --

13           THE COURT:  I'm sure she was relieved to know that

14   the answer was no on that one.  Okay.

15           MS. THEODORA:  She's on duty today.

16           THE COURT:  Okay.  All right.  Let me continue to

17   hear from you on this issue.

18           MS. HARRIS-CALVIN:  And so what I didn't hear from

19   the Government was that she was told that during this bond

20   revocation hearing, there would be arguments on the issue of a

21   potential order for searching the devices, and there was a

22   Fourth Amendment argument going to be made which was part of

23   the letter that I submitted to this Court.  So, like I said,

24   the Government circumvented a live issue --

25           THE COURT:  A Fourth Amendment argument to be made

PROCEEDINGS                    51

1  about the circumstances under which pretrial had taken the

2  devices now, a different one?

3          MS. HARRIS-CALVIN:  With respect to the FBI --

4          THE COURT:  Meaning, whether I could just simply

5  check a box and have them go to the FBI in the absence of a

6  warrant.

7          MS. HARRIS-CALVIN:  Right.  Ordering a search of the

8  devices.  And so instead of having you review that issue and

9  hear argument on that issue, which I said you checking the box

10  or however that would be -- would be equivalent to a general

11  warrant, which is forbidden by the Fourth Amendment, the

12  Government went less than 24 hours before you heard this

13  issue, this live issue, at least on the docket, to the

14  magistrate to completely circumvent this.  And I think this is

15  a jurisdictional issue that is before this Court.

16          And so I would love to brief this instead of just

17  argue it to you right now.  And so I would ask that you stay

18  execution.  There's -- pretrial has the devices.  There's no

19  reason to believe that this -- whatever's on those devices

20  will disappear, right, they're not ephemeral.  And so I don't

21  think there's any harm to the Government for allowing my

22  ability to litigate this issue before this Court under which I

23  raised it initially.

24          THE COURT:  Okay.  And what would -- explain to me

25  what the claim would be.  I understand your desire to have me

PROCEEDINGS                                    52

1  grant a stay so that you can further brief it.  But now that a

2  warrant is issued and the Government is essentially

3  withdrawing as moot, their request to have me do what pretrial

4  had asked, which was simply send the devices to the FBI.  Now

5  that a warrant has issued, what is the issue or issues that

6  you anticipate at this juncture you would want to litigate

7  that would in any way change Judge Merkle's determination

8  based on the affidavit that there was probable cause to submit

9  those devices to the FBI?

10        MS. HARRIS-CALVIN:  I mean, I've had since about

11  6:00 p.m. last night to review them.  So my initial thoughts.

12  Please, don't hold me to them --

13        THE COURT:  Just to give me a sense so that I

14  understand the purpose of the stay.

15        MS. HARRIS-CALVIN:  Yeah.  Is that it's overbroad,

16  it's not particularized enough, the scope is too broad, and I

17  do think that there are factual misrepresentations in them on

18  my first reading.  Again, I am going to need to sit with them

19  longer.

20        And I'm not saying they're intentional

21  misrepresentations, but I do believe that there are some

22  arguments to be made there in terms of the factual basis of

23  probable cause determination and the breadth of the warrant.

24        THE COURT:  Okay.  All right.  Let me hear from you

25  on that issue.

PROCEEDINGS                         53

1          MS. THEODORA:  It's very clear that the person that

2     is subject to a search warrant does not have understanding to

3     challenge the execution of the search warrant.  I can give the

4     Court a case law on that.  There's a Supreme Court case

5     that -- and I can just quote it, The Constitution protects

6     property owners, not by giving them license to engage the

7     police in the debate over the basis of the warrant, but by

8     interposing ex ante that deliberate impartial judgment of a

9     judicial officer, between the citizen and the police, and by

10    providing the ex post a right to suppress evidence improperly

11    obtained and a course of action for damages.

12          So that is *United States versus Grubb*, which is 457

13    U.S. at 99, and there's also some other cases I can provide

14    the Court with.  There's one out of the district of D.C. that

15    discusses this issue.  There's a WestLaw cite that I can read

16    off, 2021 WL 2302800.  The Constitutional protections for a

17    search warrant as I just summarized are prior to the

18    execution -- prior to the issuance of the warrant, deliberate

19    impartial judgment of a judicial officer for probable cause,

20    which is what we had.  Judge Merkle is a judicial officer,

21    she's impartial to this case, and if the defendant wants to

22    raise any of the issues that counsel just mentioned, her

23    remedy is to bring a motion for suppression.

24          THE COURT:  So what's the reason why you presented

25    it to Judge Merkle as an emergency application?  I'm unclear

1    about that.

2            MS. THEODORA:  We wanted to -- counsel said that we

3    needed to get a search warrant.  We wanted to preserve the

4    evidence because she also requested in her letter that Your

5    Honor give the devices back to the defendant, at one point.

6    And so we went through the standard process that we go for

7    every single search warrant which is going to the duty

8    magistrate and having them review our affidavit and having an

9    agent swear it out.

10           There was no deviation from that.  That's exactly

11   what we do in any other case.

12           THE COURT:  Okay.  All right.  Yes.

13           MS. HARRIS-CALVIN:  I just want to -- I haven't had

14   the opportunity to do a lot of research on this for the

15   reasons stated, and that's why I'd like a stay.  I would point

16   the Court to a case where Judge Brodie did issue a stay,

17   briefly.

18           There is a small factual difference in that the

19   warrant had started to be executed but not completed, and so

20   then she issued a stay.  And then at that point, she did say

21   just let's move forward with the suppression because they've

22   already started a warrant, so this is slightly different.  But

23   I just want to say that there is some precedent for at least

24   issuing a stay for a little bit more thought and argument on

25   this.

PROCEEDINGS                    55

1              That's *United States versus Bryan*, with a Y,

2   *Ferrada*, 16 Crim 511 MKB, for Judge Brodie.  I would say also

3   there was -- just to clarify a point that the Government made

4   is that -- I did not say that in my letter of motion that the

5   Government needed to go get a warrant.  I said that this Court

6   should hear argument on the issue of an order allowing them to

7   do -- allowing --

8              THE COURT:  Whether in the absence of a warrant they

9   should get the relief they were requesting.

10              MS. HARRIS-CALVIN:  Exactly.  That's number one.

11   Number two, I also didn't say that we should just get the

12   devices and be able to, you know, get rid of evidence.  I said

13   specifically in my motion, that there should be a Cellebrite

14   download to preserve the evidence on the device so that we

15   could protect against exactly what the Government is claiming

16   they were trying to protect against by seeking the search

17   warrant.  So I just wanted to makes those two clarifications

18   for the Court.

19              THE COURT:  Okay.  All right.

20              Let me -- give me just a minute.  I'm going to take

21   a look at my notes and then I will address some of what's been

22   raised before me today.

23              MS. HARRIS-CALVIN:  I'm sorry, Your Honor.  Can I

24   say one more thing and I promise I'll stop?

25              THE COURT:  Sure.  Absolutely.

PROCEEDINGS                          56

1          MS. HARRIS-CALVIN:  I just wanted to point at the

2     part with respect to if there are conditions or combination of

3     conditions to reasonably assure compliance and the safety of

4     the community, I just wanted to point to another case in this

5     courthouse that's another child pornography case where the

6     defendant was using the internet devices and actually was

7     trying to actively hide those devices and hide the searches on

8     the devices and those searches were for looking for teen girls

9     on porn -- pornographic websites and the like, which is more

10    egregious than the allegations here.

11         Judge Kovner did not revoke his release.  She let

12    him remain on ankle monitoring and just a curfew.  Didn't even

13    make him have even more stringent freedom of mobility, but

14    just added an additional condition with respect to him not

15    having access to particular internet-capable devices.  And

16    that he had to go to Counsel's office to use the

17    internet-capable devices for purposes of his defense.

18         THE COURT:  And what was the restriction in that

19    case that he was alleged to have violated; do you know?

20         MS. HARRIS-CALVIN:  The monitoring restriction by

21    pretrial services where they -- he -- what was alleged was

22    he -- it was a child pornography case, he was not allowed to

23    access the internet at all, and was told that pretrial

24    services had to have access to his devices.

25         Sorry, let me clarify.  He was allowed to have

1    internet access, but pretrial services -- he had the same

2    restriction in terms of pretrial services monitoring and

3    access.  And what he was alleged to have done was downloaded

4    some kind of software that made it so pretrial services

5    couldn't view particular time periods of internet activity.

6         So when they looked at his phone, they didn't see

7    that activity, but when they looked at his computer, I guess

8    the two were connected.  They saw that activity and realized

9    that he had done something to his phone to make it so that

10   they couldn't see it on his phone.

11        THE COURT:  So he was allowed to have an internet

12   access but not to access the sexually explicit content and he

13   had done something to evade that and was thereby accessing it.

14        MS. HARRIS-CALVIN:  And so -- and what he was

15   accessing was much more similar to the allegation.  He was

16   looking for pornographic websites that had teenagers or people

17   who appeared to be teenagers.  So Judge Kovner didn't even put

18   him on home incarceration, as opposed to curfew.  She just

19   further restricted his access to internet-capable devices, and

20   said he could use the internet at his counsel's office.

21        So I just wanted to you that example.

22        THE COURT:  Thank you.  That's helpful context.

23        Okay.  Give me just a minute.

24        (Pause in the proceedings.)

25        THE COURT:  Okay.  So first I'm going to address the

PROCEEDINGS                                    58

1   bond revocation motion, and then I'm going to address this

2   question about what to do about or not to do about the warrant

3   for the FBI to search the contents of the devices that were

4   previously seized.  With respect to the revocation motion as

5   the parties are aware and I'll recite this for the record, in

6   order to revoke a previously issued bond at a hearing, I must

7   find that either there's probable cause to believe that the

8   person on bond has committed a crime or there's clear and

9   convincing evidence that the person has violated any condition

10  of release, and in addition, if one or both of those findings

11  are made, the Court must also find that either there is no

12  condition under 18 U.S.C. Section 3142(g) that would ensure

13  the person would not flee or pose a danger to the community

14  or, that the person is unlikely to abide by any conditions of

15  release.

16          So with respect to this finding, I am going to grant

17  the motion to revoke and I'll state my reasons for the record.

18  I do not find at this time that there's probable cause to

19  leave that Mr. John committed a crime while on bond that is

20  since bond was granted in November, that there is some

21  evidence offered on proffer that the hard drives that were

22  seized contained CSAM.  It's unclear and the Government hasn't

23  proffered, at this point, that that was created or obtained

24  during the time he was on bond as opposed to previously.

25          However, I do find that the Government has presented

PROCEEDINGS                                   59

1    clear and convincing evidence that Mr. John violated

2    conditions of his release.  I'm going to, though there are a

3    number of allegations made, limit it to the ones that do not

4    appear to be in dispute, factually, and from which I think

5    there is a clear and convincing evidence that this violation

6    or violations were knowing and intentional.

7             Specifically, the device referred to in the motion

8    papers as Android Number 1 which was a smartphone and

9    internet-capable device that was in his pocket during the

10   pretrial home visit, which pretrial confirmed was connected to

11   the internet and the router at the time when no one else was

12   home, was a serious violation.  It was, in my view, a knowing

13   violation based on what is known to me now, though I do accept

14   and appreciate the defense has not had the opportunity to have

15   their own people, as a technical matter, inspect the device

16   and confirm there were presentations made in the current

17   posture.  But I don't think that there was any ambiguity at

18   all in Judge Bloom's order that he was not to have access to

19   the internet or an internet-capable device.  In addition,

20   Ms. Lopez repeatedly counseled both Mr. John and his mother

21   that he was allowed to possess one, and only one phone, which

22   was the Jitterbug.  Not only did he go to great lengths to get

23   one, and potentially, two other Android devices, and to enlist

24   the aid of another person to root or otherwise reconfigure

25   those devices which involved at least some person, maybe not

PROCEEDINGS                    60

1    Mr. John, having access to the internet.

2              Even if I were to accept the defense's

3    representation that he did that simply for the purpose of

4    reconfiguring the keyboard to make it easier to type and text

5    on, he did not disclose that to pretrial, and I am deeply

6    concerned about the fact that there was clearly internet

7    access at the time, in addition to the fact that at least

8    based on what's known to me now, there had been multiple

9    applications that had been downloaded to permit internet

10   access, pass the point when the keyboard had already been

11   reconfigured.

12             In addition, since he was not permitted to access

13   the social media because that would require use of the

14   internet, the fact that in these messages with this individual

15   named Angie, he was asking her for her Snapchat handle so that

16   he could communicate with her on that platform.  I think

17   there's clear and convincing evidence that Mr. John, in some

18   form or fashion, whether it's through his third party or on

19   his own, had access to Snapchat and was only asking her for

20   her Snapchat handle for the obvious purpose of communicating

21   with her, and potentially others through that platform.

22             I agree with defense counsel there was no suggestion

23   in the messages that he was seeking to have those

24   communications for the purpose of further violating a term of

25   bond, meaning that he was not attempting, necessarily to

PROCEEDINGS                    61

1    elicit CSAM from her in that forum.  Nevertheless, given the

2    risk to the public, if someone with Mr. John's history, and

3    given the allegations against him, the indictment and the

4    complaint, that he was to have access to Snapchat or any other

5    forum.

6           In addition, the screenshot taken from the phone

7    that based on proffer, has been represented to me was actually

8    taken with the phone as opposed to sent in by third party,

9    indicates that at some point whoever had that phone took a

10   screenshot of both Reddit and Discord.  And defense counsel's

11   acknowledged based on the information known to her that she

12   has no explanation for the Discord access or the reason why a

13   Discord screenshot would be on the phone, at this point.

14          Putting aside the explanation given for the possible

15   mental health treatment, reasons why the Reddit platform is

16   there and given the frequency with which those who are under

17   age use both Reddit and Discord, that adds to my additional

18   concerns about the safety to the community.

19          I've also taken into account, as I must, as

20   Judge Bloom did at the original detention hearing, the

21   relevant aspects of the current charges and Mr. John's

22   history, including his prior conviction in Sweden that

23   involved a home break-in with some indications that he may

24   have been poised to carry out physical violence towards the

25   young woman and her family in that forum, as well as the very

PROCEEDINGS                                    62

1    serious charges in the pending case in Virginia that involve

2    not only repeated communications with minors for the purposes

3    of obtaining CSAM or engaging in unlawful sexual activity, but

4    also very explicit threats to harm and murder that young woman

5    and her family after she cut off contact with him.  Again,

6    these are uncharged -- excuse me, these are unadjudicated

7    allegations, but they are part of the reason why Judge Bloom

8    put Mr. John on the most restrictive conditions.  And, you

9    know, it is unfortunate and troubling, based on what's

10   available to me now, to see that less than two months after

11   being placed on these conditions and on home incarceration, he

12   was unable to resist and have the technical know-how to

13   circumvent pretrial already in this fashion.

14          In addition, I do not yet know, based on what's

15   available, the precise reason why the FBI did not seize the 20

16   or so hard drives that he had at his residence.  But I am

17   troubled by the disconnect between Mr. John's representation

18   through his counsel that he possessed those devices prior to

19   the time the search warrant was executed, and yet, somehow in

20   doing as they typically do, and I have no reason to think they

21   didn't do in this circumstance, and by Mr. John's own account,

22   because there was a fair amount of chaos resulting after they

23   left, a very thorough search of his home, and executing a

24   warrant, but somehow, these 20 devices, which according to the

25   agent present here through counsel for the Government,

PROCEEDINGS                                63

1   included a number of videos containing what appears to be

2   CSAM, but these devices evaded detection.  And whether that's

3   because they were stored offsite or because they were hiding

4   in a place where the FBI couldn't find them, that raises

5   further concerns in my mind about the danger to the community.

6          So I do find that the requirements under 3148(b) are

7   met, both that there's clear and convincing evidence that

8   Mr. John, based on what's available to me now, has violated a

9   condition of release and both prongs of the second part are

10  met.  Namely, that at present, I do not believe that there are

11  any conditions, and after I have duly considered those

12  proposed by the defense, that would ensure that he would not

13  pose a danger to the community.  And I do not believe at this

14  time that he is likely to abide by any further conditions of

15  release if I were to release him on those conditions.

16         So for that reason, I'm going to enter an order of

17  detention and to revoke his bond at this point.

18         Let me now turn to -- let me just say this, I do

19  recognize the defense made what I recognize is a good faith

20  request to review the devices and have an additional

21  opportunity to review what was presented as the basis for the

22  motion.  So as in all cases where bond is revoked or where

23  detention is ordered, this is without prejudice to your

24  ability to make renewed bond application.  If you decide that

25  it is, in fact, in your client's interest to seek a renewed

PROCEEDINGS                64

1    order allowing him to be released on bond after you've had a

2    greater opportunity to review, to do some additional research,

3    whatever it is you need to do, and you think it is something

4    that would change the assessment I have here -- I'm not sure

5    given what I know at this juncture, even if the facts were as

6    you represented them to be that would change my view, but it's

7    certainly without prejudice to your ability to do so.

8            And it may also be that you decide, at this point,

9    given your resources, it's in your interest to defend the

10   underlying case, challenge the new warrant, but I will leave

11   that to you.  And, of course, you can present a new package if

12   you believe that there's a reason either to reconsider this

13   decision or to set bond anew.

14           All right.  Let me turn now to this question about

15   the warrant that was just issued by Judge Merkle.  I do not

16   doubt the Government's good-faith belief that they have

17   probable cause to have the devices searched.  I am deeply

18   concerned, however, about the manner in which this was

19   presented to Judge Merkle as an emergency application while

20   there was a similar request from the defense to maybe to have

21   those issues be heard.  I don't think this was an attempt to

22   end-run around my jurisdiction, but if I were Judge Merkle, I

23   think I would have wanted substantially more information about

24   the nature of the defense's request, and I am concerned that

25   she may have misconstrued the application as a way to give the

PROCEEDINGS                                65

1    defense what they were asking for, rather than to create

2    something that would be bulletproof under the good-faith

3    exception to the warrant requirement once it was obtained over

4    a holiday weekend.

5           Given that Judge Merkle is on criminal duty this

6    week, I think the appropriate person to take those concerns to

7    is Judge Merkle.  I wasn't present for the conversation that

8    the Government had with her.  I don't know what her thinking

9    was and whether this information about the current posture

10   would have changed her view.  But I think it is appropriate

11   that the parties appear before her either today or later this

12   week.  So while I have not independently researched my

13   authority, to stay the execution of the warrant to the extent

14   the Government thinks I don't have the authority to do so,

15   you're welcome to file a letter before me.  But at this time,

16   out of an abundance of caution to allow Judge Merkle to hear

17   the parties out about both the potential overbreadth of the

18   warrant and any concerns the defense has raised about how it

19   was presented to her, and the particular posture in which it

20   arose, I am going to, at this time, direct the Government and

21   pretrial to hold on to those devices here, rather than

22   transmit them to the FBI until Judge Merkle has a chance to

23   review this issue.  If it can't be resolved before her, then

24   you can file letters before me if there's any further remedy

25   that either of you seeks to have me order.

PROCEEDINGS                                    66

1          All right.  Any questions about either of those

2     rulings at this time?

3          MS. HARRIS-CALVIN:  I only have one.  Thank you,

4     Your Honor.  And I only have one with respect to revocation.

5          I would ask that he be able to surrender on a date

6     and time-certain as opposed to today.  I just want to --

7     there's no reason to believe he's going to, you know, engage

8     in any criminal activity, even if it's 24 hours.

9          THE COURT:  So how much time are you asking for?

10         MS. HARRIS-CALVIN:  I would ask for at least

11    24 hours, Your Honor.

12         THE COURT:  Okay.  And pretrial has his passport; is

13    that correct?

14         PRETRIAL OFFICER LOPEZ:  Yeah, we have his passport,

15    Your Honor.

16         THE COURT:  Let me hear from the Government on this

17    request.

18         MS. THEODORA:  We would object to this request.  I

19    think the defendant has shown that he is -- his motive is to

20    disregard Court conditions.  I don't think he's likely to

21    abide by his conditions.  I think he has a strong incentive to

22    flee, given the 15-year mandatory minimum in this case.  He

23    also is a dual citizen of the Grenadines and St. Vincent.  I

24    know we have his passport, but we would strongly object.

25         THE COURT:  Okay.  All right.  I am going to deny

PROCEEDINGS                    67

1    the application to have him surrender later, given the nature

2    of the allegations and given possible concerns about flight,

3    even though he doesn't currently have his passport, given the

4    threats of violence towards others who have previously cut off

5    contact with him or cooperated with the Government given the

6    allegations currently about, in particular, an individual that

7    came to light today, in this public forum regarding the

8    individual, the friend who voluntarily turned over the devices

9    to the Government and voluntarily gave an interview to the

10   Government about possible criminal activity on his part.

11          Mr. John, I have no reason to think that you

12   wouldn't appear as directed, but I think, given the

13   circumstance and some aspects of your history that have been

14   briefed before me, I'm not comfortable giving you additional

15   time for that reason.  All right.

16          Anything further before we adjourn?

17          MS. HARRIS-CALVIN:  Not from the defense, Your

18   Honor.

19          MS. THEODORA:  Nothing from the Government.

20          THE COURT:  I'm going to stay here for a moment.

21   Let me just ask you a technical question about the order.  I

22   have the standard order of detention.  It's unclear to me,

23   given that it's a revocation, whether it applies in this

24   circumstance given that it's a 3148(b) order, rather than the

25   order of detention pending trial.

PROCEEDINGS                    68

1          I see you have a supervisor here.  I'm not sure if

2     she knows the answer to this.  I have not yet had cause to

3     remand someone on a revocation proceeding.

4          I have the standard order of detention pending trial

5     that was prepared.  It looks as though the findings that are

6     listed are ones under 3142(e), and since this is a 3148(b)

7     proceeding because it's a revocation, I can hand it up.  Since

8     it's the 3148(b) proceeding because it's a revocation, I can

9     hand it up to you but --

10          MS. FARRELL:  May I take a look?

11          And, Your Honor, this is Kaitlin Farrell for the

12     U.S. Attorney's Office.

13          THE COURT:  Sure.  Thank you.

14          MS. FARRELL:  Your Honor, I don't think this -- I

15     understand Your Honor has another matter.  Do you want us

16     to --

17          THE COURT:  Yeah, I think it probably makes sense.

18     Why don't the parties confer and see if there's a different

19     order that you think I should enter in light of the particular

20     posture of this motion.

21          And then, with respect to going before Judge Merkle,

22     given that the Government has the devices and I have at least

23     temporarily directed them not to transfer them to the FBI, if

24     she can't see you today for whatever reason or if you think it

25     would give you all an opportunity to confer or otherwise

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

PROCEEDINGS                                    69

1    prepare to be before her, and you'd like to see her later in

2    the week, I'll leave that to you and Judge Merkle.  But I

3    think the sooner the better would probably be helpful for

4    everyone.

5              MS. FARRELL:  Thank you, Your Honor.

6              MS. THEODORA:  Thank you.

7              MS. HARRIS-CALVIN:  Thank you.

8

9              (Whereupon, the matter was concluded.)

10

11                       *     *     *     *     *

12

13

14   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
15

16        s/ Avery N. Armstrong              January 23, 2025
          AVERY N. ARMSTRONG                 DATE
17

18

19

20

21

22

23

24

25